# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TEDDY MAGEE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-3988** |
| **TIMOTHY HOOPER** | **SECTION: "G"(3)** |

## REPORT AND RECOMMENDATION

Petitioner, Teddy Magee, a state prisoner, filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  For the following reasons, **IT IS RECOMMENDED** that his petition be **DISMISSED WITH PREJUDICE**.

The state court record reflects that petitioner was charged by bill of information with one count of home invasion and one count of second degree sexual battery under Louisiana law.[1]  On January 30, 2012, he was found not guilty of home invasion but guilty of second degree sexual battery.[2]  On May 18, 2012, he was then found to be a fourth offender and was sentenced as such to term of twenty years imprisonment.[3]  On May 22, 2013, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[4]  The Louisiana Supreme Court thereafter denied his related writ application on December 6, 2013.[5]

On December 2, 2014, petitioner filed an application for post-conviction relief with the state district court.[6]  His application was denied on August 24, 2016.[7]  He was then likewise denied

---

[1] State Rec., Vol. 1 of 5, bill of information.
[2] State Rec., Vol. 3 of 5, transcript of January 30, 2012, p. 149.
[3] State Rec., Vol. 1 of 5, minute entry dated May 18, 2012.
[4] State v. Magee, 116 So. 3d 948 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 5.
[5] State v. Magee, 129 So. 3d 530 (La. 2013); State Rec., Vol. 5 of 5.
[6] State Rec., Vol. 5 of 5.
[7] See State Rec., Vol. 5 of 5, Docket Master minute entry dated August 24, 2016.

relief by the Louisiana Fourth Circuit Court of Appeal on November 23, 2016,[8] and by the Louisiana Supreme Court on March 9, 2018.[9]

On April 15, 2018, petitioner filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[10]  The state filed a response conceding that the application is timely but arguing that petitioner's claims have no merit.[11]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The

---

[8] State v. Magee, No. 2016-K-0969 (La. App. 4th Cir. Nov. 23, 2016); State Rec., Vol. 4 of 5.
[9] State v. Magee, 237 So. 3d 1182 (La. 2018); State Rec., Vol. 5 of 5.
[10] Rec. Doc. 3.
[11] Rec. Doc. 11.

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to

3

extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that*

*there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (emphasis added; citations omitted); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White v. Woodall,

572 U.S. 415, 417 (2014).

## II.  Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of

the case as follows:

> Detective Bianca Deirish of the New Orleans Police Department ("NOPD")
> testified that on 10 October 2010, she reported as the first responding officer to an
> apartment complex at 4109 Encampment Street in New Orleans.  Although she
> could not recall the exact time of day, she recalled that it was daylight at the time,
> and that a female victim, C.B.,[FN2] and another woman were in an apartment on
> the second floor of the apartment building.  Detective Deirish recalled that it
> appeared that a fight had occurred, that things had been turned over, and that the
> scene was "really nasty and gruesome" for it appeared from a trail of feces and
> blood that someone had been dragged from the toilet and down the hallway to the
> living room.  She stated:
>
>> When you walk in, there was feces.  When you get to the
>> living room there was feces on the carpet.  There was feces on the
>> sofa.  The sofa set was like, an "L" shape, and there was [sic] hand
>> prints, it looked like, with feces, in the feces.  There was a lot of
>> blood.  That was the living room.
>> As you get to the bathroom, there was feces all across the
>> floor leading to the hallway, into the bedroom.  And there was feces

on the bed, on the comforter, on the sheet, on the floor, along with
blood and some other type of fluid.

[FN 2]  We refer to the victim in this case by her initials only to protect her
identity.

Detective Deirish testified that she found C.B. lying on her back in the living
room, partially covered with a small towel.  She had blood and feces on her hands,
legs, and feet.  She also had blood on one of her toes, which was missing a toenail,
and bruising on her neck, legs, inner thighs, and along one arm.

The detective spoke to C.B. regarding her injuries and asked who had
inflicted the injuries upon her, but C.B. only provided vague answers and cried.
When asked where she was hurt, C.B. responded by pointing at her buttocks and
then touched her vaginal area.  Detective Deirish stated that she asked C.B. what
happened, and she said her ex-boyfriend assaulted her but refused to disclose his
name.  While at the apartment, the detective entered the bathroom and discovered
several pieces of mail bearing Magee's name at that address.  The detective spoke
to the other woman in the apartment, C.B.'s aunt, and also obtained the defendant's
name from her.  Detective Deirish then asked C.B. about the defendant, at which
time C.B. cried hysterically and put her head in her hands, unable to answer.  The
aunt's statement was consistent with the vague account that had been provided by
C.B.  The detective observed the absence of signs of forced entry.

Detective Merrell Merricks of the Sex Crimes Division of the NOPD
testified that when he arrived on the scene at 4109 Encampment Street on 10
October 2010, C.B. had already been transported to the hospital.  The Crime Lab
was called to the scene, and photographs were taken.

Upon being asked to describe each room individually, Detective Merricks
first described the bathroom, which he testified showed signs of a struggle, for the
door had been forced open.  He also observed a trail of blood and fecal matter on
the bathroom floor, which continued on to the bedroom.  In the bedroom, he
observed a trail of blood and fecal matter on the floor that originated in the
bathroom and blood and fecal matter on the bedspread and mattress.  The trail of
blood and fecal matter continued to the living room.  He did not recall seeing
anything broken at the scene, and observed no signs of forced entry into the
apartment.  However, Detective Merricks observed signs of forced entry at the
bathroom door, as the door frame appeared broken.  He could not recall whether
the door was splintered or whether the handle was out of position from its screws,
and he did not believe that any of the Crime Lab photographs showed signs of
forced entry on the bathroom door.

When asked whether a suspect had been developed by the time he arrived
on the scene, Detective Merricks testified that Magee, who was the victim's ex-
boyfriend, was a suspect.  Mail bearing the defendant's name and the address of the
scene was found in the bathroom.  He spoke with C.B.'s aunt at the scene and asked
her whether she knew the defendant.  He also spoke with C.B. at the hospital, at

which time he observed "strangulation marks around her neck, bruises to the face, to the, some bruising over her body as well." Detective Merricks testified that he also "observed a bite mark to her, to her buttocks, if I'm not mistaken, and [C.B.] had severe damage to her vaginal area as well." He testified that when he visited C.B. in the hospital, "[s]he was crying, afraid, and in pain." The detective testified that "[w]e never got to that point [of discussing whether or not she wanted to press charges] when I arrived at the hospital" and that C.B. did not indicate at that time that she wanted to press charges.

Detective Merricks asked C.B. what had occurred and who had harmed her, and C.B. told him that she was out with a male friend at a club the night before, and while at the club, she observed the defendant, her ex-boyfriend, was also at the club. When she noticed that the defendant appeared upset, she was afraid and asked her male friend to leave with her. The detective stated that C.B. told him that when she left the club with her male friend, she noticed that the defendant was following them in another vehicle, and she asked her friend to take her to the Third District police station so that she could have a police escort home.[FN 3] After that, C.B. told the detective that she spent the night at her aunt's house, waking up early the next morning to get ready for work. C.B. walked across the street to the apartment, locked the door behind her, and began preparing for work.

> [FN 3]  Officer Jermaine Faulkner of the NOPD testified that on 9 October 2010, C.B. approached him while he was in a parking lot at the intersection of Mirabeau and Paris Avenues in New Orleans. C.B. appeared frightened and indicated that someone was following her. Officer Faulkner took C.B. back to her residence on Encampment Street and asked who was following her.

Detective Merricks testified that C.B. told him that as she was sitting on the toilet, she heard a noise, and the bathroom door was forced open by the defendant, who was "in a rage" and grabbed her by her hair and pulled her off the toilet. C.B. said that the defendant was screaming at her and that he penetrated her vaginally with his hand, advising her that she would never have sex with another man again. After C.B. managed to break away, the defendant again grabbed her by her hair and dragged her into the bedroom and penetrated C.B. vaginally and anally. C.B. told the detective that her neighbor heard her screaming and asked if she was okay, and C.B. asked the neighbor to call the police. Magee fled the residence shortly thereafter.

Detective Merricks subsequently showed C.B. a single photo lineup on a separate occasion, after which time he secured a warrant for Magee's arrest. When asked to describe C.B.'s demeanor at the time C.B. identified Magee in the photographic lineup, he testified that when he "informed her of what [his] investigation would lead to, she immediately, I guess you could say, shut down on me" and decided not to press charges. The detective stated that C.B. told him that she did not want the defendant arrested or to go to jail. C.B. ultimately signed the single photo photographic lineup identifying it as a photograph of Magee, "but identifying him as not the person who assaulted her."

The detective testified that he took a written statement from C.B. after she signed the photograph which read:

> I, [C.B.], do not want to press charges on [the defendant]. I just want [the defendant] to leave me alone. I did not call the police, and I don't want the police involved.

He advised C.B. that she had already provided a corroborated statement to him and other police officers, and his department had determined to proceed with the investigation.

Shamica Sullivan, a registered nurse and a sexual assault nurse examiner ("SANE") at University Hospital, testified that she treated C.B. on 10 October 2010 and wrote a report in connection with her examination of C.B.; the report was admitted into evidence. After C.B. was examined by the physician, Ms. Sullivan obtained C.B.'s consent for the sexual assault examination and asked C.B. to provide a brief statement regarding what had occurred to cause her injuries. Reading from her report, Ms. Sullivan testified regarding C.B.'s account of the incident:

> Okay. This is in [C.B.'s] own words. And she says that, "I was coming from sleeping by my auntie's because I had to be to work for nine o'clock this morning. I went to the bathroom to run my water, then I had to have a bowel movement. When I was sitting on the toilet, I heard a noise. The next thing I know, [the defendant] was jumping on me, throwing me everywhere and putting his hands in my butt and my vagina trying to make sure I didn't have sex with somebody. My neighbor must have heard the noise and called the police because I was hollering help, and she said, 'I hear you, [C.B.].'"

Continuing to read from her report, Ms. Sullivan testified as follows:

> And I'll say, she states, "I went out last night, and my boyfriend saw me talking with this guy at the club. When I left the club, I stayed by my auntie's house, because I had to be to work for nine o'clock in the morning. I got up, went to my house, looked around to see if somebody was there. I didn't see anybody, so I went to the bathroom to run my water, but I had to have a bowel movement. So I sat on the toilet, and then I heard a noise. And it was too late for me to run. He came in and started throwing me everywhere, kicked me, punched me, jumping on me. He put his fingers in my vagina and butt to see if I had had sex and called me stuff like 'ho' while he was doing it. I was hollering for help and my neighbor heard. She said, 'I hear you, [C.B.]. I'm calling the

police.'  She also started yelling so my neighbors could hear.  After that, he ran."  And I put, "Photos obtained."

When questioned regarding C.B.'s injuries, Ms. Sullivan testified that C.B. had "numerous abrasions" around her neck, and bruising to her right upper forearm, to her left arm, and on her right upper thigh.  C.B. also had a hematoma on the back of her neck, a bite mark on her left buttock, and her left foot toenail was missing.  Ms. Sullivan stated that C.B. was covered in fecal matter and blood and that when she examined C.B.'s vagina, she observed vaginal tears caused from a person's fingernails.[FN 4]  When asked whether C.B.'s account of the incident was consistent with the injuries on C.B.'s body, Ms. Sullivan answered in the affirmative.  After the examination, C.B. requested to take a shower, which was permitted, as C.B. had been cleared to move around after having a CAT scan.  C.B. was "visibly upset" and "crying a lot" while Ms. Sullivan was questioning her.

> [FN 4]  Ms. Sullivan also testified that she observed a "peanut-shaped mass" on C.B.'s anus that did not appear to have been caused by the trauma, but was covered in blood and fecal matter.

Andrew Nakamoto, M.D., who treated C.B. at University Hospital at approximately 9:50 a.m. on 10 October 2010 testified that C.B. was first treated by a triage nurse.  The triage record indicated that C.B. had no past medical history and noted "status post assault with fist on c-spine precautions,[FN5] plus abrasions to face.  No loss of consciousness."

> [FN 5]  Dr. Nakamoto explained that patients who have any kind of visible trauma to the EMS personnel will have a C-collar and a spine board used.

Reading from the emergency department physician patient record, Dr. Nakamoto testified that the report read that C.B. was a twenty-nine year old, African-American female that had been sexually assaulted by her boyfriend at 8:45 a.m. that day.[FN 6]  Dr. Nakamoto also testified that C.B. "state[d] that the male penetrated her vagina with his fist" and choked her, but "denie[d] any penial [sic] penetration," loss of consciousness, or head trauma.  Also indicated in Dr. Nakamoto's report was C.B.'s statement that "the male bit her on her right buttock" and that she complained of neck pain, pelvic pain, and some blood on her upper thigh.

> [FN 6]  Christopher Canning, a paramedic with the EMS responding to the Encampment Street call on 10 October 2010, testified at trial.  He and another paramedic, Kenny Hender, assisted C.B., who advised them that she had been assaulted, kicked, punched, and raped.  Mr. Canning recalled that C.B. had "minor abrasions throughout" as well as vaginal bleeding and trauma to her face.  He testified that C.B. told him that her vaginal bleeding was caused by the attacker forcing his hand into her vagina.

Mr. Canning also made a Patient Care Report of the incident that was introduced into evidence. When asked to clarify certain abbreviations on the report, he testified "the person knows who she is, where she is, what time it is, and she remembers clearly what happened." He further stated that the report indicated that "[h]er airway, breathing and circulation were intact" in both lungs, and abrasions and scrapes on the side of C.B.'s head present, but no deformity on her face. Additionally, the report indicated that C.B. could move all of her extremities, "and her pulse, motor, and sensory functions were all intact in both her arms and her legs." C.B. was moved onto a "long spine board," a plastic board to immobilize her in case of a neck or back injury, and a plastic collar was placed around her neck. Mr. Canning explained that the spine board was used because the abrasions and trauma to C.B.'s head could have resulted in forces upon her neck. When asked whether C.B. complained that she was unable to walk, Mr. Canning responded negatively.

Dr. Nakamoto further testified that he noted that C.B. had no past cervical history; C.B. was alert and oriented; her posterior cervical spine was tender to palpitation; and she had abrasions on both sides of her neck. He also noted in the report that her "belly [wa]s soft;" that she had a visible lesion to her right lateral buttock area; that she had visible blood on her medial thighs and vagina area; and that the toenail from her big left toe had been ripped off, causing a "good blood flow." Because C.B. had so much visible trauma, before sending C.B. to the SANE nurse, Dr. Nakamoto ordered a urinalysis to test for pregnancy, a CAT scan of her cervical spine, and a "CTA" of C.B.'s neck, which "evaluates the arteries and veins in your neck to make sure that there's no disruption of the artery or that you didn't tear or transect any kind of vasculature in your neck." He also prescribed "Delalutin"[FN 7] for pain and Zoloft for nausea.

[FN 7] The word was transcribed "Delalutin" but appears to have been "Dilaudid."

When asked to describe C.B.'s demeanor, Dr. Nakamoto testified that she was very upset, tearful, "in a lot of pain, a lot of distress" and was very upset about the incident. Next, Dr. Nakamoto was shown photographs of C.B. after the incident and described C.B.'s appearance. He testified that she had abrasions to her left cheek; ecchymosis, or bruising of the neck; and blood and feces on her upper thighs and vaginal area, consistent with being assaulted anally and vaginally. He noted that when he examined C.B., visible bite marks were present on her left buttock, but that the bite marks were not visible in the photograph. He testified that C.B. did not lose consciousness.

After the state rested its case-in-chief, a conference between counsel regarding C.B.'s testimony was held in chambers and outside of the presence of the jury. Thereafter, C.B. testified in the presence of the jury that she had a fight with the defendant on 10 October 2010. She testified that on that morning she slept at her best friend's mother's house because she was a "little tipsy" from the night before and could not locate her keys. That morning, she found her keys, walked home, and began preparing to go to work. As she was sitting on the toilet, she

observed the defendant, who had apparently entered the house immediately after she did, and "charged at him," and the two "started fist fighting" all over the house. C.B. further testified that she was throwing things at Magee, who "was trying to choke [her]" in an effort to defend himself from the objects which C.B. was throwing. When asked whether the defendant touched her vaginal area, C.B. testified that Magee accused her of having intercourse with another man, at which time she advised him to touch her to verify whether this was true; Magee complied.

On cross-examination, C.B. testified that she had known Magee for thirteen and a half years, and she admitted that she did not want to see him get into any trouble. When asked whether C.B. remembered speaking to a police officer after leaving a club at approximately 3:00 a.m. on 9 October 2010, she responded in the affirmative, testifying that "someone" was following her and her friend, so she asked her male friend to take her to the police station around the corner from her house. C.B. did not recall telling the officer that the person following her drove a silver car, and she denied that the defendant drove a silver car, stating that he did not have a car. C.B. also denied telling the officer that she wanted to sleep at a neighbor's home because she was afraid, insisting that she "was never afraid of [the defendant]" and that she advised detectives and doctors of same. C.B. further denied remembering speaking to a 911 operator after the incident,[FN 8] but testified that she recognized her voice when the 911 tape was played. C.B. further testified that when the 911 operator asked where the defendant lived and she responded that he lived on the Westbank instead of on Encampment Street, she was "angry" and that the defendant actually lived with her at 4109 Encampment. When questioned regarding her statement to the 911 operator that Magee was driving around the corner in a car, C.B. again insisted that the defendant did not have a car. C.B. denied that Magee forced his hands inside of her without her consent. When questioned whether she consented to the cut on her face, C.B. responded, "[w]e was fighting." C.B. further testified that she consented to the bite mark on her buttocks and again stated that they were fighting. With regard to the injury to her toe, C.B. testified that she stubbed it. When presented with photographs of her injuries, C.B. similarly testified, "[y]es, I allowed him to do that." C.B. denied telling the SANE nurse that the defendant kicked in the door.[FN 9]

[FN 8] Yolanda Haynes, a 911 operator as well as a custodian of records, testified at trial. Ms. Haynes testified that when a 911 call is received, the location address is noted and an item number is assigned to the call. She reviewed the incident recall sheet regarding the 911 call made in this case, which is a printed sheet of what was recorded on the 911 tape and also listened to the 911 tape. Both the tape and incident recall sheet were introduced into evidence.

[FN 9] C.B. testified that Magee had a key to her house.

When questioned regarding her statements to the responding officers who came to her home about how she thought the defendant followed her home the night before, dragged her across the house, and forced his hands inside of her, C.B.

responded, "I was angry at the time" and that she allowed Magee to "check" her. C.B. testified that she told police that she was not raped and that she did not want to press charges.[12]

### III.  Petitioner's Claims[13]

### A.  Mode of Trial

Petitioner argues that he was improperly tried by a six-person jury, rather than a twelve-person jury as required by Louisiana law.  As a matter of state law, he is correct.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal held:

> A review of the record evidences an error patent as to the number of jurors and the correctness of the jury vote as to count one.
> La.C.Cr.P. art. 782 states:
>
> A.  Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. **Cases in which punishment is *necessarily* confinement at hard labor *shall* be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.**  Cases in which the punishment ***may*** be confinement at hard labor **shall** be tried by a jury composed of **six** jurors, all of whom must concur to render a verdict.
>
> B.  Trial by jury may be knowingly and intelligently waived by the defendant except in capital cases.  [Emphasis supplied.]
>
> La. Const. art. I, § 17 provides in pertinent part:
>
> (A) Jury Trial in Criminal Cases.  A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.  A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.  A case in which the punishment may be confinement at hard labor or confinement without hard labor for

---

[12] <u>State v. Magee</u>, 116 So. 3d 948, 949-55 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 5.
[13] For ease of analysis, the Court will address petitioner's claims in a different order than they were listed in his federal application.

more than six months shall be tried before a jury of six persons, all of whom must concur to render a verdict....

(B) Joinder of Felonies; Mode of Trial. Notwithstanding any provision of law to the contrary, offenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor; provided, however, that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; and provided further, that cases so joined shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.

In count one, Magee was charged with the crime of home invasion. La. R.S. 14:62.8 governs the crime of home invasion and provides in pertinent part:

A. Home invasion is the unauthorized entering of any inhabited dwelling, or other structure belonging to another and used in whole or in part as a home or place of abode by a person, where a person is present, with the intent to use force or violence upon the person of another or to vandalize, deface, or damage the property of another.

B. (1) Except as provided in Paragraphs (2) and (3) of this Subsection, **whoever commits the crime of home invasion** shall be fined not more than five thousand dollars **and *shall be imprisoned at hard labor*** for not more than twenty-five years. [Emphasis supplied.]

Accordingly, the jury in this case should have been composed of 12 jurors, ten of whom must have concurred to render a verdict, pursuant to La.C.Cr.P. art. 782.[FN 10]

[FN 10] The crime of second degree sexual battery is punishable with or without hard labor. La. R.S. 14:43.2 states: "Whoever commits the crime of second degree sexual battery shall be punished by imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than fifteen years."

In State v. Brown, 11-1044 (La. 3/13/12), 85 So.3d 52, the Supreme Court addressed the issue of whether a defendant who had been tried by a jury of twelve instead of six was entitled to a new trial. In Brown, the state charged the accused with one count of simple burglary of a religious building, a violation of La. R.S.

14:62.6, and one count of simple burglary, a violation of La. R.S. 14:62 (the second count was subsequently severed).   A 12-person jury convicted the accused of burglary of a religious building by a ten-to-two vote, and he was sentenced to 12 years at hard labor without benefit of probation, parole, or suspension of sentence. The court of appeal reversed the conviction and sentence upon discovering the jury composition error *ex proprio motu* as an error patent.

The Supreme Court reversed, finding that the accused actively participated and failed to object at any stage of the proceedings to the incorrect number of jurors.[FN 11]  The Court acknowledged that "[l]ongstanding jurisprudence of this Court had [previously] considered errors involving trials conducted in the wrong jury forum, whether the selected panel included a greater or lesser number of jurors than required by law, non-waivable jurisdictional defects which rendered any verdict returned absolutely null," but noted that "under present law, trial of a six-person jury offense in a 12-person jury forum may take place if the offense is joined in a single proceeding with a 12-person jury offense, i.e., with an absolute felony necessarily punishable at hard labor."  Id. at p. 2, 85 So.3d at 53.

> [FN 11]  The Court acknowledged that the trial was conducted with the incorrect number of jurors.  Brown, 11-1044, p. 2, 85 So.3d at 53.

The Court determined that it did not need to reach the issue of whether the jury composition error prejudiced the defendant's case because the defendant did not object to the incorrect jury composition and "actively participated in constituting the wrong jury forum."  Id. at p. 4, 85 So.3d at 54.  Rather, "[i]n post-verdict motions for a new trial, arrest of judgment, and judgment of acquittal, [the defendant] attacked the sufficiency of the evidence supporting his conviction, but he did not raise the error with respect to jury composition, although La.C.Cr.P. art. 859(4) specifically provides, as one ground for arresting judgment, that '[t]he tribunal that tried the case did not conform with the requirements of Articles 779, 780 and 782 of this code.'"  Id.  Additionally, the defendant did not raise the error at the appellate level, although he "questioned the validity of a non-unanimous verdict on Sixth Amendment grounds."  Id.

The Court went on to distinguish its previous decision in State v. Jones, 05-0226 (La. 2/22/06), 922 So.2d 508, which "held that the error in trying a six-person jury offense in a 12-person jury forum no longer constitutes a non-waivable structural defect in the proceedings but 'falls within the vast category of trial errors which are subject to harmless error analysis and which warrant reversal only where the defendant is actually prejudiced.'"  Brown, 11-1044, p. 3, 85 So.3d at 53. Notably, the Court also recognized "Jones specifically cautioned that: 'Our holding here today does not guarantee the same result would be reached if a *lesser* number of jurors had been empaneled than required by law, or if there was not unanimity of verdict.'"  Id. at p. 4, 85 So.3d at 54 [emphasis supplied].

The Court concluded:

However, **because Jones made clear that the error of trying a six-person jury offense before a 12-person jury falls within the "vast numbers" of trial errors subject to harmless-error analysis, as opposed to errors interjecting a structural or jurisdictional defect in the proceedings, a necessary corollary of the decision is that the error also falls within the scope of Louisiana's procedural default rules which generally require a defendant to timely preserve trial errors in the trial court for later appellate review.** See, e.g., La.C.Cr.P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."). Grounds for arresting judgment as a matter of La.C.Cr.P. art. 859, including jury composition errors under La.C.Cr.P. art. 782, may provide narrow exceptions to Louisiana's general contemporaneous objection rule. See State v. Thomas, 427 So.2d 428, 433 (La. 1982) (on reh'g) (although Louisiana does not have the equivalent of "plain error," "[c]ertain rights are so basic that the Code of Criminal Procedure provides that they may be raised for the first time in arrest of judgment."); State v. Gardner, 351 So.2d 105, 107 (La. 1977) ("Defendant properly raised this error [in jury composition] in his motion in arrest of judgment ... no objection was necessary at the time of the jury selection, nor was a showing of prejudice required."). **However, in the present case, respondent neither objected at the time of jury selection, nor moved in the trial court in arrest of judgment, on grounds that the composition of his jury violated the terms of La. C.Cr.P. art. 782.** In the latter case, and even assuming that a defendant may participate actively in constituting the wrong jury forum and then complain after verdict about the error in the district court, a motion in arrest of judgment on those grounds "must be filed and disposed of before sentence." La.C.Cr.P. art. 861.

Under these circumstances, Jones has modified our former rule that "an error in the size of the jury is discoverable on the face of the record and therefore we may note it *ex proprio motu* without formal objection or an assignment of error" as a basis for reversing a defendant's conviction and sentence. State v. Smith, 367 So.2d 857, 858 (La. 1979). **That rule was based on the now discarded supposition that errors in jury composition are invariably jurisdictional or structural in nature. *In the present case, to the extent that [the defendant] failed altogether to employ the procedural vehicles provided by law for preserving the error for review, he waived any entitlement to reversal on appeal* on grounds that he was tried by a jury panel which did not conform to the requirements of La. Const. art. I, § 17 and La.C.Cr.P. art.**

15

> **782 because it included a greater number of jurors than required by law, although the error is patent on the face of the record.**  See Jones, 05-0226 at 5, 922 So.2d at 516 (Weimer, J., concurring).

Brown, 11-1044, pp. 4-6, 85 So.3d at 54–55 [emphasis supplied].

The facts in the case at bar are not analogous to Brown, because Magee had *fewer* jurors than required, whereas in Brown, the defendant had *more* jurors than required.  We find that Brown is not applicable to this case and that the principle of law in Jones is still applicable; Magee did not waive his entitlement to reversal based upon a jury panel that did not conform to the requirements of La. Const. art. I, § 17 and La.C.Cr.P. art. 782.

We do not find that a harmless error analysis is applicable to this case.  The Louisiana Supreme Court noted in State v. Haddad, 99-1272 (La. 2/29/00), 767 So.2d 682, 689:

> Harmless error analysis begins with the premise that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational factfinder and asks whether beyond a reasonable doubt the error could not have contributed to the verdict actually returned by the defendant's jury.  Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).  In that case, the United States Supreme Court stated:

>> The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.

> Id. at 2081.

As previously noted herein, pursuant to La.C.Cr.P. art. 782 and La. Const. art. I, § 17, Magee's jury panel should have been comprised of 12 jurors, ten of whom must have concurred to render a verdict on count one, the alleged violation of La. R.S. 14:62.8.  The six-person jury acquitted Magee on that felony charge.  His acquittal on the La. R.S. 14:62.8 charge stands and is valid.

Magee was convicted by a panel comprised of six jurors on count two, the alleged violation of La. R.S. 14:43.2.  A correct number of jurors decided his guilt on that charge.  Therefore, as to count two, no error patent exists.[14]

---

[14] State v. Magee, 116 So. 3d 948, 955-58 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 5.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[15]

To the extent that petitioner is asking this federal court to hold that the state courts wrongly interpreted and applied state law, the Court cannot oblige. The state courts are the final arbiters of state law. See Levy Gardens Partners 2007, L.P. v. Commonwealth Land and Title Insurance Co., 706 F.3d 622, 629 (5th Cir. 2013) ("The principle that state courts are the final arbiters of state law is well-settled."); Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding to review errors under state law." (internal citation and quotation marks omitted)); see Charles v. Thaler, 629 F.3d 494, 500-01 (5th Cir. 2011) ("A federal court lacks authority to rule that a state court incorrectly interpreted its own law. When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions *are* state law."). Simply put: modes of trial are matters of *state* law, and "[w]hether the state followed its own procedure is not the concern of a federal habeas court." Manning v. Warden, Louisiana State Pentientiary, 786 F.2d 710, 712 (5th Cir. 1986). Rather:

> The simple fact is that habeas corpus is available only for the vindication of rights existing under federal law; not rights existing solely under the rules of state procedure. When there has been a violation of state procedure, the proper inquiry is to determine whether there has been a constitutional infraction of defendant's due process rights which would render the trial as a whole fundamentally unfair.

Id. at 711-12 (citations and quotation marks omitted). See also Dahlem v. Poret, Civ. Action No. 16-11835, 2017 WL 3721518, at *5 (E.D. La. Aug. 28, 2017) (Brown, J.) ("[T]o the extent

---

[15] State v. Magee, 129 So. 3d 530 (La. 2013); State Rec., Vol. 5 of 5.

Petitioner argues that his trial by a six-person jury violated state law, this claim is not cognizable on federal habeas review.").

Further, to the extent that petitioner is claiming that his trial was in fact rendered fundamentally unfair under federal law by the fact that a six-person jury was used, that argument is meritless. The United States Supreme Court has expressly rejected the contention that twelve-person juries are required as a matter of federal constitutional law or that trials tried to twelve jurors are necessarily fairer than those tried to six:

> The purpose of the jury trial … is to prevent oppression by the Government. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence. *The performance of this role is not a function of the particular number of the body that makes up the jury.* To be sure, the number should probably be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representatives cross-section of the community. *But we find little reason to think that these goals are in any meaningful sense less likely to be achieved when the jury numbers six, than when it numbers 12 – particularly if the requirement of unanimity is retained. And, certainly the reliability of the jury as a factfinder hardly seems likely to be a function of its size.*

Williams v. Florida, 399 U.S. 78, 100-01 (1970) (citation, footnote, and quotation marks omitted; emphasis added).

For all of these reasons, petitioner's request that he be granted federal habeas corpus relief on the grounds that the wrong mode of trial was used should be denied.

### B.  Sufficiency of the Evidence

Petitioner also claims that there was insufficient evidence to support his conviction. On direct review, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

Magee … argues that the evidence presented at trial, viewed in the light most favorable to the prosecution, was not sufficient for any rational trier of fact to have found him guilty of second degree sexual battery (count two).

In State v. Ferdinand, 12-0283, pp. 6-7 (La.App. 4 Cir. 1/30/13), 107 So.3d 1266, 1270-71, this court again acknowledged the well-settled standard for reviewing a sufficiency claim:

> When reviewing the sufficiency of the evidence to support a conviction, this Court is controlled by the standard set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction "the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La. 1984). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 2002-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79. Under the Jackson standard, **the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court.** State v. Juluke, 98-0341 (La. 1/8/99), 725 So.2d 1291, 1293.
>
> **When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its sufficiency.** State v. Allen, 94-1895 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078. The trier of fact determines the weight to be given the evidence presented. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Helou, 2002-2302, p. 5 (La. 10/23/03), 857 So.2d 1024, 1027.
>
> A fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson v. Virginia, *supra*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573-74. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See State v. Mussall, 523 So.2d 1305, 1310 (La. 1988). [Emphasis supplied.]

La. R.S. 14:43.2 pertains to the crime of second degree sexual battery and provides, in pertinent part:

A. Second degree sexual battery is the intentional engaging in any of the following acts with another person when the offender intentionally inflicts serious bodily injury on the victim:

(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or

(2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.

B. For the purposes of this Section, **serious bodily injury means bodily injury which involves** unconsciousness, **extreme physical pain** or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.  [Emphasis supplied].

Magee argues that although the state may have presented sufficient evidence to prove each element of the crime charged, the evidence was circumstantial because C.B. testified that she consented to the defendant's acts.  Therefore, Magee argues that the state failed to disprove his reasonable hypothesis of innocence, as C.B. testified that she initiated the fight with him that resulted in abrasions to her neck and head area while defending herself, and that she consented to him digitally penetrating her vagina.  Magee further argues that C.B. never advised anyone that the defendant's actions were without her consent, and therefore, an essential element of the offense of second degree sexual battery was not established.

Contrariwise, the state argues that C.B.'s testimony contradicts five other witnesses, all of whom testified that C.B. indicated that she did not consent to the defendant penetrating her vagina, and that the competing testimony regarding whether C.B. gave her consent does not establish reasonable doubt.  Additionally, the state submits that the jury found the state's witnesses to be credible and apparently disbelieved C.B.'s testimony.

As previously noted herein, this court has recognized the well-settled principle that conflicting testimony regarding factual matters goes to weight of the evidence:

[C]onflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency.  State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir. 1989).  Like all factual matters, credibility determinations are entitled to great weight and will not be disturbed

unless contrary to the evidence.  Id., citing State v. Vessell, 450 So.2d 938 (La. 1984).

State v. Fortenberry, 11-0022, p. 7 (La.App. 4 Cir. 7/27/11), 73 So.3d 391, 396.

      In this case, the jury's determination that Magee was guilty of second degree sexual battery was not contrary to the great weight of the evidence.  Although C.B. may have recanted the version of events that she relayed to the responding officer, Detective Deirish, the SANE nurse, Dr. Nakamoto, and Detective Merricks, the state presented sufficient evidence to establish that the defendant intentionally inflicted serious bodily injury and caused extreme physical pain to C.B.  Detective Merricks testified regarding his interview with C.B. in the hospital after the incident, at which time C.B. told him that the defendant grabbed her by her hair and penetrated her anally and vaginally.  Similarly, Shamica Sullivan, the SANE nurse, testified regarding her report of C.B.'s account of the incident, wherein C.B. told her that Magee jumped on her, threw her, kicked her, punched her, and put his hands in her vagina and her anus.  Likewise, Dr. Nakamoto testified that according to his emergency department physician patient record, C.B. told him that her assailant penetrated her vagina with his fist, choked her, and bit her right buttock, and that C.B.'s injuries were consistent with being assaulted anally and vaginally.

      With regard to whether the defendant caused C.B. serious bodily injury, the state established that Magee intentionally caused "serious bodily injury" to C.B. which caused "extreme physical pain," thereby meeting the requirements of proving a second degree sexual battery pursuant to La. R.S. 14:43.2.  In addition to the testimony above, Ms. Sullivan testified that C.B. had vaginal tears caused by the defendant's fingernails, numerous bruises and abrasions, a missing toenail, and a bite mark on her right buttock.  When asked whether C.B.'s injuries were consistent with C.B.'s account of the incident, Ms. Sullivan testified in the affirmative.  Dr. Nakamoto similarly testified that C.B. told him that she had neck and pelvic pain, and he also observed the missing toenail and resulting blood.

      This assignment of error lacks merit.[16]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[17]

      Because a claim challenging the sufficiency of the evidence presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly

---

[16] State v. Magee, 116 So. 3d 948, 958-60 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 5.
[17] State v. Magee, 129 So. 3d 530 (La. 2013); State Rec., Vol. 5 of 5.

established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 F. App'x 860, 866 (5th Cir. 2016), aff'd, 137 S. Ct. 2058 (2017). For the following reasons, the Court finds that he has made no such showing.

As the Louisiana Fourth Circuit Court of Appeal correctly noted, claims challenging the sufficiency of the evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) ("[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. ...  Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.").  Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."  Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson, 566 U.S. 650, 651 (2012).

Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, *only* the <u>Jackson</u> standard need be satisfied, even if state law would impose a more demanding standard of proof.   <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); <u>Higgins v. Cain</u>, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), <u>aff'd</u>, 434 F. App'x 405 (5th Cir. 2011); <u>Williams v. Cain</u>, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), <u>aff'd</u>, 408 F. App'x 817 (5th Cir. 2011); <u>Davis v. Cain</u>, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); <u>Wade v. Cain</u>, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), <u>aff'd</u>, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); <u>see also</u> <u>Coleman</u>, 566 U.S. at 655 ("Under <u>Jackson</u>, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Here, as accurately explained in the Louisiana Fourth Circuit Court of Appeal's opinion, the testimony of the officers and the medical personnel was sufficient to prove beyond a reasonable doubt that petitioner intentionally inflicted serious bodily injury, in the form of extreme physical pain, in the violent touching of C.B.'s anus and/or genitals.   C.B.'s recantation of her initial statements to those witnesses does not change that result, because the jurors obviously found the testimony of the state's witnesses more credible than petitioner's recantation.   It is beyond cavil that such credibility determinations are the province of the jurors, and a federal habeas court generally will not grant relief on a sufficiency claim grounded on matters of credibility.   <u>See</u>

Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007). The fact that the victim recants her initial accusation at trial does not change this analysis. See, e.g., Littlesun v. Parker, 380 F. App'x 758 (10th Cir. 2010) (finding that the evidence was sufficient to support the petitioner's convictions despite the fact that the victim recanted her accusations at trial, saying that she had staged the crime scene and lied to the police in order to get even with her husband for refusing to give her money).

In summary, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

### C. Ineffective Assistance of Counsel

Lastly, petitioner claims that he received ineffective assistance of counsel. The United States Supreme Court has established a two-prong test for evaluating such claims. Specifically, a petitioner seeking relief on such a claim is required to show both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington,

24

466 U.S. 668, 697 (1984).  The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the

relative role that the alleged trial errors played in the total context of [the] trial."   Crockett, 796

F.2d at 793.

In the last reasoned state court opinion addressing petitioner's ineffective assistance of

counsel claims, the Louisiana Supreme Court denied relief on the merits, stating simply:  "Relator

fails to show he received ineffective assistance of counsel under the standard of Strickland v.

Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[18]

Because an ineffective assistance of counsel claim presents a mixed question of law and

fact, this Court must defer to that state court decision rejecting petitioner's claim on the merits

unless the decision was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §

2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Further, the United States

Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an

ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the
> Strickland standard was unreasonable.  This is different from asking whether
> defense counsel's performance fell below Strickland's standard.  Were that the
> inquiry, the analysis would be no different than if, for example, this Court were
> adjudicating a Strickland claim on direct review of a criminal conviction in a United
> States district court.  Under AEDPA, though, it is a necessary premise that the two
> questions are different.  For purposes of § 2254(d)(1), an unreasonable application
> of federal law is different from an incorrect application of federal law.  A state court
> must be granted a deference and latitude that are not in operation when the case
> involves review under the Strickland standard itself.
> A state court's determination that a claim lacks merit precludes federal
> habeas relief so long as fairminded jurists could disagree on the correctness of the
> state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140,
> 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a
> rule application was unreasonable requires considering the rule's specificity.  The
> more general the rule, the more leeway courts have in reaching outcomes in case-

---

[18] State v. Magee, 237 So. 3d 1182 (La. 2018); State Rec., Vol. 5 of 5.

> by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly
> established Federal law for a state court to decline to apply a specific legal rule that
> has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S.
> ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation
> marks omitted).

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then

explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-
> assistance claim can function as a way to escape rules of waiver and forfeiture and
> raise issues not presented at trial, and so the Strickland standard must be applied
> with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the
> very adversary process the right to counsel is meant to serve.  Even under *de novo*
> review, the standard for judging counsel's representation is a most deferential one.
> Unlike a later reviewing court, the attorney observed the relevant proceedings,
> knew of materials outside the record, and interacted with the client, with opposing
> counsel, and with the judge.  It is all too tempting to second-guess counsel's
> assistance after conviction or adverse sentence.  The question is whether an
> attorney's representation amounted to incompetence under prevailing professional
> norms, not whether it deviated from best practices or most common custom.
> Establishing that a state court's application of Strickland was unreasonable
> under § 2254(d) is all the more difficult.  *The standards created by Strickland and
> § 2254(d) are both highly deferential, and when the two apply in tandem, review is
> doubly so.*  The Strickland standard is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts must guard against the danger of
> equating unreasonableness under Strickland with unreasonableness under §
> 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions
> were reasonable.  The question is whether there is any reasonable argument that
> counsel satisfied Strickland's deferential standard.*

Id. at 105 (emphasis added; citations omitted).  Therefore, on a habeas review of an ineffective

assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the

benefit of the doubt."  Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation

marks omitted).  For the following reasons, the Court finds that, under those stringently deferential

standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective

assistance of counsel claims.

In the instant case, petitioner argues that his counsel was ineffective in the following respects.

First, petitioner argues that counsel was ineffective for allowing the admission of "incredibly gruesome crime scene photographs … depict[ing] multiple scenes at the locations and blood and human excrement."[19]  Specifically, he faults counsel for allegedly "open[ing] the door" to the photographs' admission by questioning Detective Merrell Merricks regarding purported hearsay.[20]  He also faults counsel for allegedly failing to object to the admission of the photographs.[21]  For the following reasons, the Court rejects those contentions.

At trial, the prosecution moved to introduce crime scene photographs during the Merricks' testimony.  **Defense counsel objected**, arguing that the photographs' authenticity had not been established.  At that point, a bench conference was held off the record.  Immediately thereafter, the trial judge sustained the objection as to some but not all of the photographs, stating: "I didn't present the problem, and I hope you understand what my ruling is.  I didn't present the issue."[22]  The prosecutor then replied that she did not understand the ruling, at which point the following exchange occurred:

> BY THE COURT:
>     Bring [the victim] in –
>
> BY MS. PARKER [a prosecutor]:
>     If it can be put on the Record, we can take –
>
> BY THE COURT:
>     Bring [the victim] in, and I have no problem with that.  Okay?  That's my ruling.

---

[19] Rec. Doc. 3-2, p. 13.
[20] Id. at p. 16.
[21] Id.
[22] State Rec., Vol. 3 of 5, transcript of January 30, 2012, p. 45.

BY MS. TRUHE [a prosecutor]:

      And, Judge, just for the Record, the Detective did testify as to directing these photos to be taken.  He identified individually each photo as taken from the scene, and that's a fair and accurate representation.  The foundation has been laid as to these photos, Judge.  And we'd ask that they be allowed to be entered into evidence and published to the jury.

BY THE COURT:

      And I said I was going to allow those in your hand, Ms. Truhe, so proceed.

BY MS. TRUHE:

      Judge, I don't know how we're picking and choosing which photos the jury can see and which ones they can't.

BY THE COURT:

      All right.  As I mentioned to you before, since we're putting everything on blast, if you've got the lady to come in to say that it was not consensual, rough sex, then you can let all those in.  Okay, ma'am?[23]

The prosecutor then asked for a stay to take writs, which the judge denied,[24] and the following

exchange occurred:

BY MS. TRUHE:

      Whether or not the victim comes in –

BY THE COURT:

      Ms. Truhe –

BY MS. TRUHE:

      – has nothing to do with the foundation.

BY THE COURT:

      – questions for your witness, please.

BY MS. TRUHE:

      Okay.  Since we can't view the photos of the scene, I'm going to take you through –

---

[23] <u>Id.</u> at pp. 45-46.
[24] <u>Id.</u> at p. 47.

BY THE COURT:
> I did not say that. I said that I will allow in those photographs that you had in your hand. All right?

BY MS. TRUHE:
> But, Judge, that's is [sic] not all of the scene. We can't pick and choose which ones are coming in.

BY THE COURT:
> All right. You pick and choose all the time, ma'am.

BY MS. TRUHE:
> Okay.[25]

At that point, the prosecutor then simply asked Merricks to describe the crime scene without introducing any of the photographs.

Later in the proceeding, the prosecutor attempted to introduce photographs of the victim in connection with Merricks' testimony. **Defense counsel again objected**, and another bench conference was held off the record, during which the judge apparently sustained the defense objection. Immediately thereafter, the prosecutor stated: "And again, just for the Record, Judge, note our objection that the Officer's not being allowed to view the photos and identify these that this is the condition of the victim appeared before him with his own eyes at the hospital."[26]

After additional testimony from Merricks, the prosecutor then again moved to introduce the photographs, as follows:

BY MS. TRUHE:
> Judge, at this time, I would just reurge to be able to publish the photos that the Officer, excuse me, Detective has authenticated and identified at this point.

BY MR. LAWRENCE [defense counsel]:
> Your Honor, we would object, Your Honor, to all those –

---

[25] Id. at pp. 47-48.
[26] Id. at p. 52.

BY MS. TRUHE:
  Judge, if I could just have a basis for the objection as to why he can't testify to the photos he authenticated.

BY MR. LAWRENCE:
  More prejudicial than –

BY THE COURT:
  I would allow he photographs in, again, for the Record, ma'am, when you bring – I'll let the victim authenticate the photographs. When you bring the victim in. All right, ma'am?

BY MS. TRUHE:
  Judge, the victim's presence doesn't have anything to do with the authentication of these photos.

BY THE COURT:
  Ms. Truhe, are you done with the detective?

BY MS. TRUHE:
  Yes, Judge.[27]

On cross-examination, Merricks was then questioned regarding whether there was evidence of forced entry into the bathroom. Before redirect questioning, another bench conference was held off the record. Immediately thereafter, the judge instructed the prosecutor to show the photographs to Merricks **over a defense objection**.[28] Without any further testimony from Merricks, the judge then allowed the prosecutor to publish the photographs to the jury.

Determining precisely what occurred at trial regarding the photographs is made difficult by the fact that much of the discussion concerning them was held off the record. However, seemingly, the trial judge initially ruled that some, but not all, of the photographs could not be introduced *unless they were authenticated by the victim* – a ruling without apparent support in the

---

[27] <u>Id.</u> at pp. 54-55.
[28] <u>Id.</u> at p. 64.

law.[29]  Then, without explanation on the record, the judge later reversed course and allowed the photographs to be introduced and published to the jury.

Nevertheless, while this Court cannot determine the reason for the judge's change of opinion, it does not appear to have been a result of defense counsel's questioning of Merricks regarding any purported hearsay – such questioning simply had no bearing on the photographs' **authentication**, the grounds on which the judge initially refused to admit the photographs. Moreover, to the extent that petitioner suggests that counsel performed deficiently by failing to object to the photographs, that is simply inaccurate.  The record reflects that counsel objected repeatedly, including immediately prior to the photographs' admission.[30]

For these reasons, the Court finds that petitioner has failed to show any connection whatsoever between the admission of the photographs and the actions or inactions of defense counsel.  With no such linkage established, petitioner's claim that his counsel was ineffective for allowing their admission necessarily fails.

Petitioner next argues that counsel was ineffective for failing to object to the six-person jury.  As noted previously in this opinion, the prosecution joined two offenses triable by different modes of trial under state law.  If counsel had objected to the joinder, then presumably the state would have been required to either (1) sever the offenses and separately try the home invasion charge to a twelve-person jury and the second degree sexual battery charge to a six-person jury or

---

[29] Louisiana law provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  La. Code Evid. art. 901(A).  Further: "Photographs are admissible when they illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted.  No further foundation is necessary."  State v. Gates, 630 So. 2d 1345, 1352 (La. App. 2nd Cir. 1994) (citations omitted).  Therefore, where a witness (in this case, Merricks) is available to testify that a photograph accurately depicts what it is purported to portray, it is properly authenticated and the proper foundation for its admission has been laid.  Id.
[30] See State Rec., Vol. 3 of 5, transcript of January 30, 2012, p. 64 (line 31).

(2) keep the offenses joined and try them together before a *twelve*-person jury.  See La. Const. Art. 1, § 17(B) ("[O]ffenses in which punishment is necessarily confinement at hard labor *may* be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor; provided, however, that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; and *provided further, that cases so joined shall be tried by a jury composed of twelve jurors*, ten of whom must concur to render a verdict." (emphasis added)).  Here, however, counsel failed to object and, as a result, the offenses remained joined and were improperly tried by only *six* jurors.

Nevertheless, even if the Court were to assume that counsel's performance was deficient for failing to make such an objection, petitioner's ineffective assistance claim still falters on the prejudice prong of the Strickland analysis.  On that prong, as noted, a petitioner must show that there is a reasonable probability that the result of the proceeding would have been different if petitioner had been tried by twelve, rather than only six, jurors.  Although he apparently believes that there would have been a different result in that situation, that belief is based on nothing more than pure speculation.  A petitioner's conclusory and speculative allegation that some other course of action by trial counsel would have brought about a different result simply does not suffice to establish ineffective assistance of counsel.  See Kinnamon v. Scott, 40 F.3d 731, 734-35 (5th Cir. 1994); see also Darby v. Johnson, No. 97-11403, 1999 WL 153045, at *2 (5th Cir. Mar. 9, 1999) ("An ineffective assistance of counsel claim based on speculation or conclusional rhetoric will not warrant habeas relief.").

Further, to the extent that petitioner argues that counsel was ineffective for failing to raise the issue of jury composition in post-trial motions or on appeal, that argument also clearly fails. Despite the fact that counsel did not raise the issue post-trial or on appeal, the Court of Appeal nevertheless raised and addressed the merits of the issue *sua sponte*. Therefore, petitioner suffered no prejudice in this respect, because the claim was in fact fully adjudicated on the merits on direct appeal.

Third, petitioner argues that counsel was ineffective for failing to object to hearsay evidence and for failing to move for a mistrial. Specifically, petitioner argues that the prosecution elicited hearsay testimony concerning statements the victim made to police. He further argues that counsel was ineffective for failing to move for a mistrial when the prosecution stated that it would not be calling the victim to testify. Those contentions likewise fail.

Concerning the purported hearsay, this Court initially notes that the transcript reflects that the prosecution took great care not to elicit hearsay testimony in its case in chief.[31] Moreover, as the state correctly notes in its response,[32] petitioner fails even to identify which testimony he believes constituted improper hearsay. In light of that fact, he obviously cannot meet his burden to prove that his counsel was ineffective for failing to object to the allegedly improper hearsay. See, e.g., Weary v. Cain, Civ. Action No. 10-1793, 2011 WL 7416509, at *13 (E.D. La. Apr. 21, 2011) ("[Petitioner] does not … identify any particular testimony which would have been objectionable or that otherwise fits the categories of hearsay or inconsistent statements. … [C]onclusory allegations of ineffective assistance of counsel, with no showing of effect on the

---

[31] See, e.g., State Rec., Vol. 3 of 5, transcript of January 30, 2012, pp. 13 (line 30), 24 (line 15), 25 (line 8), 26 (lines 11-12), and 51 (lines 1-2).
[32] Rec. Doc. 11, pp. 24-25.

proceedings, do not raise a constitutional issue sufficient to support federal habeas relief."), adopted, 2012 WL 601862 (E.D. La. Feb. 22, 2012); Posey v. Quarterman, No. 2:06-CV-0280, 2010 WL 997382, at *10 (N.D. Tex. Feb. 24, 2010) ("Petitioner argues trial counsel was ineffective for failing to object to witness statements on the basis they were hearsay. Petitioner does not identify any specific statements admitted at trial that were objectionable on the basis of hearsay and this Court will not speculate which statements petitioner is referencing. Petitioner's claim is conclusory and should be denied."), adopted, 2010 WL 996540 (N.D. Tex. Mar. 18, 2010).

In any event, even if the Court assumes that petitioner could point to some instance of improper hearsay elicited by the prosecution during its case in chief, that would not necessarily mean that counsel was ineffective for failing to object to it. On the contrary, it is clear that "[t]he failure to object generally falls within the ambit of trial strategy." Sylve v. Cain, Civ. Action No. 14-1180, 2016 WL 4592135, at *5 (E.D. La. Sept. 1, 2016) (Brown, J.) (footnote and quotation marks omitted). Moreover, strategic choices by counsel are to be afforded a high degree of deference:

> The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on matters of trial tactics through the distorting lens of hindsight. Courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.

Id. (quotation marks and footnotes omitted); accord Strickland, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. … [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances,

the challenged action might be considered sound trial strategy." (quotation marks omitted)); Burnett v. Collins, 982 F.2d 922, 930 (5th Cir. 1993); Forman v. Cain, Civ. Action No. 07-4200, 2008 WL 1746710, at *7 (E.D. La. Apr. 14, 2008).

Here, such second-guessing would be particularly inappropriate. Presumably, petitioner believes that one or more of the state's witnesses related hearsay statements made by the victim. However, even if that occurred, defense counsel was obviously aware that he intended to call the victim to testify as part of the defense's case[33] and that the victim would testify that she consented to petitioner's actions. In light of that expected testimony, the state would be able to (and, in fact, did) offer rebuttal testimony from Detectives Deirish and Merricks as to what inconsistent statements the victim had made to them.[34] Because the testimony would be admissible at that point, see La. Code Evid. art. 801(D)(1)(a), no purpose would ultimately have been served by objecting to that same testimony, if any, in the prosecution's case in chief prior to the victim's testimony.

As to petitioner's argument that counsel was ineffective for failing to move for a mistrial after the prosecution announced that it would not be calling the victim as a witness, that argument is meritless. The fact that a victim will not cooperate (as is often true in cases of domestic violence) or cannot testify (as in murder cases) obviously does not mean that the state is precluded from bringing a criminal charge against the perpetrator. Rather, it simply means that, as here, the state must be able to present sufficient evidence to prove its charge in *other ways*, such as by presenting circumstantial evidence and/or the testimony of other witnesses who are subject to cross-

---

[33] Defense counsel called the victim to testify as his first witness, stating that the victim had "always been a defense witness." State Rec., Vol. 3 of 5, transcript of January 30, 2012, pp. 106 (line 32).
[34] Id. at pp. 126-33.

36

examination.  Because the prosecution was not legally required to call the victim to testify, its failure to do so was not grounds for a mistrial.  Therefore, any motion for a mistrial on this ground would have been meritless.  It is beyond cavil that counsel cannot be considered ineffective for failing to make a meritless motion.  United States v. Gibson, 55 F.3d 173, 179 (5th Cir. 1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").

For all of the foregoing reasons, it is clear that petitioner has not demonstrated that the state court's decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

### **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application seeking habeas corpus relief filed by Teddy Magee be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[35]

New Orleans, Louisiana, this ___5th___ day of August, 2019.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[35] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

38